## 68927. MOORE v. THE STATE.
### (324 SE2d 760)

BIRDSONG, Presiding Judge.

Marvin E. Moore was indicted for murder; the jury returned a verdict for voluntary manslaughter. He appeals on the ground of jury misconduct.

The evidence shows that appellant Moore went to a liquor store in Suwanee on the night of August 30, 1983, between 8:00 and 9:00, with three companions. One witness in the store thought Moore had been drinking. While Moore was in the store, the decedent Dennis Cash drove up with his wife and another couple and parked in the liquor store parking lot one space over from the truck in which Moore had arrived. The other man, Jackie Pitts, went into the store; Mrs. Cash and her friend Deborah Cain got out of the truck and stood with the deceased by his truck door while the deceased counted out money

to give the women to spend in the store. At this point, Moore came out of the store and offered to buy the women some drinks. According to the two women, he offensively suggested they should come with him and leave Mr. Cash and his friend. The deceased reached inside his truck and got a stick, which was described as resembling a sawed-off pool cue stick. What happened next was observed by several persons but apparently happened so precipitantly as to obscure the details.

The state witnesses testified variously that the deceased never struck appellant but raised the stick as if to strike him, that the deceased struck appellant's truck, that the deceased used the stick as if to ward off the appellant or keep him at bay. Appellant testified the deceased struck him in the head with the stick so that he became groggy and was trying "to get the man off me," but he does not remember actually stabbing the deceased. The driver of appellant's truck said the deceased pulled out a sawed-off cue stick and poked appellant in the side twice, and when appellant knocked the stick away, deceased "plowed [appellant] up beside the head" with it. Some witnesses did not see what happened with the stick, or how the deceased used it. The only fact agreed upon by all is that suddenly the deceased was bleeding. He had been stabbed in the heart with a knife blade 1-¾ inches long.

The trial judge charged the jury on murder, voluntary manslaughter, involuntary manslaughter, and self-defense; he refused to charge on mutual combat, although after the verdict he commented that he thought the verdict represented voluntary manslaughter by mutual combat. The jury deliberated a while but then asked the trial court for clarification of the jury charges not as to self-defense, but as to offenses of murder, voluntary manslaughter and involuntary manslaughter. Overnight, the same juror who had acted as spokesman in asking for a re-charge, consulted a book entitled *You and The Law*, published by Reader's Digest Association, Inc. The next day he sought permission from the trial court to take the book into the jury room, but was denied. Nothing in the record indicates appellant's counsel knew of this request when it was made. Following the verdict, appellant filed a motion for new trial, contending the verdict was irremediably infected because the jury, or at least one juror, took the law from a source other than the trial court, and this extrajudicial "law," which was different from Georgia law, was prejudicial. The same contention is made on appeal. *Held:*

There is no question that the juror's study of "law" other than that charged by the trial court was misconduct and though it was honest in its intent, it was nevertheless intentional. In *Watkins v. State,* 237 Ga. 678, 685 (229 SE2d 465), the Supreme Court held: "[T]he intentional gathering of extra judicial *evidence,* highly preju-

dicial to the accused, by members of the jury and the communication of that information to the other jurors in the closed jury room is inimical to our present jury trial system." (Emphasis supplied.) The gathering or study of extrajudicial *law* is equally wrong, for obvious reasons. The question to be determined here is whether such study or gathering of extrajudicial law was "so prejudicial that the verdict must be deemed 'inherently lacking in due process.'" *Williams v. State*, 252 Ga. 7, 9 (310 SE2d 528). Under the particular facts of this misconduct, in light of the trial evidence, we are compelled to hold that it was.

The juror who studied *You and The Law*, and the jury foreman, were both thoroughly examined as to the circumstances of the verdict and the juror's study of other law. The juror's testimony, though ambiguous in many parts, was ultimately that he and the other jurors were so confused by the trial court's charge that that night he studied portions of the book concerning murder and voluntary manslaughter, since he did not think the offense was murder but was voluntary manslaughter; that he did not study the portion concerning involuntary manslaughter nor, it appears, the portion concerning self-defense. The juror testified that his readings did not help him reach his verdict or tell him what his verdict should be; but he testified that he did use them to understand what the trial court had charged as law. The foreman of the jury testified that the first thing following the night recess, after the trial court had refused the juror permission to take the book into the jury room, "pertaining to the charges that the Judge made, [the juror] tried to interpret the charges himself, voluntary manslaughter and murder. . . . That was possibly interpretations that he got from the book. . . . He told his view of what he thought he had gotten the preceding night possibly by reading books. Yes [he did try and interpret what the book said to other members of the jury]." The foreman also testified that he himself took only the law from the court but "I cannot say for what other people may have taken in the courtroom. . . . I think we basically tried to interpret what was told to us by [the trial judge] more than the book."

We can only conclude that the entire jury was subjected to the charge of extrajudicial "law." Despite the two juror witnesses' somewhat ambiguous protestations that the jury verdict was not actually affected by it, this is a conclusion or opinion only and is not something to be presumed inasmuch as the misconduct cannot be ignored (see *Watkins*, supra, p. 685) and we have no way of knowing what effect the juror's interpretations from *You and The Law* had on the others. See Alvarez v. People of Col., 653 P2d 1127, 1132 (1982) where a juror's consultation of a dictionary convinced her that her doubts as to guilt were merely "vague" and hence not reasonable. The Colorado court noted: "It is futile to speculate how the juror might have voted

without the benefit of dictionary definitions and equally futile to inquire whether the use made of the definitions resulted in a meaning of reasonable doubt consistent with the law. The defendant cannot reasonably be required to resolve these problematic matters as a part of his required showing of prejudice."

The ultimate question remains whether the misconduct was prejudicial. The extrajudicial law offered to the jury in this case was in fact prejudicial. It describes voluntary manslaughter as "a killing in which there was no intent until just before the act, which was not motivated by malice and for which there was some provocation — *as when, having been violently assaulted, you respond violently and kill your attacker*" (emphasis supplied). This description is closely akin to self-defense, or at least involuntary manslaughter by self-defense using more force than necessary. Under the evidence in this case, we cannot conclude or presume there was not at least one of the jurors who thought the appellant guilty of such lesser acts under the evidence but found him guilty of voluntary manslaughter following their fellow juror's interpretation of voluntary manslaughter as he understood it from the Reader's Digest book. Since the evidence might have authorized a finding of involuntary manslaughter if not self-defense, and the "law" given to the jury equated to some extent that legal description with voluntary manslaughter, and a verdict of voluntary manslaughter was returned, we cannot say it was highly probable the verdict was not affected by the jury misconduct. See *Bell v. State*, 163 Ga. App. 672, 675 (295 SE2d 147). We are constrained to conclude that under the evidence and the peculiar circumstances of misconduct in this case, the use of extrajudicial law was so prejudicial as to be inherently lacking in due process. *Williams*, supra, p. 9. This jury misconduct cannot be ignored and requires a reversal of the jury's verdict, and a new trial. *Watkins*, supra, p. 685.

*Judgment reversed. Carley and Beasley, JJ., concur.*

DECIDED NOVEMBER 20, 1984 —
REHEARING DENIED DECEMBER 4, 1984

*Winship E. Rees*, for appellant.
*W. Bryant Huff, District Attorney, Thomas A. Devlin, Jr., Assistant District Attorney*, for appellee.