**FOURTH DIVISION**
**DILLARD, P. J.,**
**MILLER, P. J., and RICKMAN, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 13, 2023**

# In the Court of Appeals of Georgia

A23A1258. HARRIS v. THE STATE.

MILLER, Presiding Judge.

This is Shalita Harris's second appearance before this Court following her conviction for homicide by vehicle in the first degree. See *Harris v. State*, 360 Ga. App. 695 (859 SE2d 587) (2021) ("*Harris I*"). Harris appeals from the judgment and sentence and the denial of her motion for new trial based on juror misconduct. Because the trial court did not abuse its discretion in determining that the State proved beyond a reasonable doubt that the misconduct did not contribute to the verdict, we affirm.

The following facts are taken from *Harris I*, supra, 360 Ga. App. at 696-697:

On January 29, 2018, Harris, a school bus driver for Houston County schools, was driving on Forest Park Drive as part of her afternoon drop-off route. She was carrying 33 elementary school students, ranging

in age from pre-kindergarten to fifth grade, and one adult school bus monitor. One section of the road went downhill at a gradient of approximately 11.9 percent, and in the downhill portion there was a sharp turn to the left. The posted speed limit for the road was 25 miles per hour ("mph"), but the suggested speed for the curve, as displayed on a yellow traffic sign, was 15 mph. It was common for children to throw their hands up as they entered this part of the route, "as if they were on a roller coaster," and yell "hands up"; this day was no different.

According to testimony at trial, Harris had previously driven the bus on this stretch of road without issue. However, the bus monitor testified that on this day the bus's front wheels left the road as it entered the curve, and Harris was unable to regain control. The bus left the road, struck nearby trees and a dirt embankment, and flipped over on its right side. Six-year-old A. H., who was sitting behind Harris and near the aisle, was ejected from the bus during the crash and suffered fatal injuries. A. H. was transported to the hospital, but ultimately died from the trauma she sustained during the crash.

At trial, Harris's brother testified that he had spoken with her just after the crash, and that she had stated "I was going too fast." Additionally, a student who rode on the bus that day stated that although it did not feel "much faster than the previous times," it did feel fast that day.

Both the State and Harris offered expert testimony regarding key details surrounding the crash. The State's expert testified that the speed at which a school bus could safely navigate the curve on the road was

between 17 and 20 mph. He testified that at the time the bus left the road, however, it was traveling between 29 and 35 mph. He concluded that "the bus had to [have been] traveling at least 24.516 [mph] to cover the distance from the roadway exit point to the first major impact." In contrast, Harris's expert testified that he believed the bus was traveling approximately 17.75 mph when it entered the curve, and approximately 24 mph when it left the road.

We add here that a post-crash inspection of the bus did not discover any mechanical issues that could have contributed to the crash.

Harris was charged with one count each of homicide by vehicle in the first degree (OCGA § 40-6-393 (a)), reckless driving (OCGA § 40-6-390 (a)), speeding (OCGA § 40-6-181), and driving too fast for conditions (OCGA § 40-6-180), and two counts of homicide by vehicle in the second degree (OCGA § 40-6-393 (c)). The charge of first-degree vehicular homicide alleged that Harris caused the death of A. H. by engaging in reckless driving. One of the charges of second-degree vehicular homicide alleged that Harris caused the death of A. H. by speeding, while the other such charge alleged that Harris caused the death of A. H. by driving too fast for conditions. The trial court directed a verdict of acquittal on the charge of driving too fast for conditions and the charge of second-degree vehicular homicide based on driving too fast for conditions.

3

The jury found Harris guilty of first-degree vehicular homicide and reckless driving but acquitted her of speeding and second-degree vehicular homicide based on speeding. The reckless driving count merged with the first-degree vehicular homicide count for sentencing purposes, and the trial court sentenced Harris to ten years, with the first three years to be served in prison and the remainder to be served on probation.

Immediately after the trial, Harris's counsel spoke with two jurors and learned that during deliberations some of the jurors had obtained extrajudicial information about the difference in the severity of the charges. Harris filed a motion for new trial, arguing, among other things, that jurors had engaged in misconduct during deliberations by researching the available sentences for her charges.

All 12 jurors testified at the hearing on the motion for new trial.[1] Juror C. S.

testified that she "Googled the difference between first and second degree" during a

recess from deliberations and that she informed other jurors that first-degree vehicular

homicide was a felony and second-degree vehicular homicide was a misdemeanor.

_____

[1] As the Supreme Court of Georgia noted in a prior appeal in this case, the trial court correctly recognized the limitation imposed upon inquiry into the jury's deliberations by OCGA § 24-6-606 (b), which provides that:

> Upon an inquiry into the validity of a verdict or indictment, a juror shall
> not testify by affidavit or otherwise nor shall a juror's statements be
> received in evidence as to any matter or statement occurring during the
> course of the jury's deliberations or to the effect of anything upon the
> jury deliberations or any other juror's mind or emotions as influencing
> the juror to assent to or dissent from the verdict or indictment or
> concerning the juror's mental processes in connection therewith;
> provided, however, that a juror may testify on the question of whether
> extraneous prejudicial information was improperly brought to the juror's
> attention, whether any outside influence was improperly brought to bear
> upon any juror, or whether there was a mistake in entering the verdict
> onto the verdict form.

(Citation and emphasis omitted.) *Harris v. State*, 314 Ga. 51, 55 & n. 3 (2) (875 SE2d 649) (2022). Specifically, the trial court instructed counsel that they were limited to asking jurors about "whether extraneous prejudicial information was brought to their attention" and that counsel could not ask them "how or if that [information] influenced their verdict."

5

C. S. testified that based on her Google search she knew "what the sentence range was, and . . . how much time Ms. Harris could get in prison." C. S. denied sharing the sentencing range with other jurors.

Juror S. E. testified that during a recess from deliberations she "used Google to determine first degree versus second degree" and that based on the Google search and her general knowledge she knew that some of the charges were more serious than others in terms of punishment. Other jurors testified that during deliberations a juror informed them that first-degree vehicular homicide was a felony and carried a harsher sentence than second-degree vehicular homicide, which was a misdemeanor. Some jurors testified that their knowledge that certain charges were more serious than others came from the indictment and their general knowledge. Juror A. J. provided conflicting testimony as to whether he knew the sentencing ranges for the charged offenses during deliberations. With the exception of C. S. and A. J., the jurors denied having known such ranges.

The trial court denied the motion for new trial, ruling that (1) the presumption of prejudice, which had previously applied upon a finding of juror misconduct, did not survive enactment of the current Evidence Code, and (2) there was no reasonable probability that the verdict was influenced by the extrajudicial information. This

6

Court affirmed on appeal, concluding that the trial court did not abuse its discretion because the jurors' improper actions were harmless beyond a reasonable doubt. *Harris I*, supra, 360 Ga. App. at 699 (1). This Court explained that the extrajudicial information obtained by some of the jurors had to do with the difference in the severity of the crimes as opposed to the underlying substantive law or evidence. Id. at 698-699 (1).

Harris subsequently sought certiorari review with the Supreme Court of Georgia, which concluded that the trial court erred in (1) ruling that the presumption of prejudice arising from a showing of juror misconduct no longer applied, and (2) failing to determine whether the State proved that the misconduct was harmless beyond a reasonable doubt. *Harris v. State*, 314 Ga. 51, 54-55 (2) (875 SE2d 649) (2022) ("*Harris II*"). The Supreme Court further concluded that while this Court properly recognized the presumption of prejudice and the State's burden in rebutting it, this Court "erred when it concluded as a matter of law that, while extrajudicial information obtained by a juror about the underlying substantive law or evidence could prejudice a defendant, extrajudicial information about the difference in the severity of the crimes had no potential to cause prejudice." (Citation and punctuation

omitted.) Id. at 56 (2). The Supreme Court noted the well-established prohibition on jurors' consideration of punishment in reaching a verdict, stating that

> the concern with injecting sentencing considerations into the guilt-innocence phase of a trial is that, if the jury can discern what sentence(s) the defendant on trial is facing, it might use that knowledge to fashion a verdict that will result in the sentence the jury wishes to see imposed upon the defendant being tried, rather than deciding the defendant's guilt or innocence based on the evidence and underlying substantive law provided by the court.

(Citation and punctuation omitted.) Id. at 58 (2). Accordingly, the Supreme Court vacated this Court's decision and instructed that the trial court should apply the proper legal principles in ruling on Harris's juror misconduct claim. Id.

On remand, the trial court again denied Harris's motion for new trial. The court found that "[o]nly one juror [A. J.] suggested he knew the sentencing range for either charge," but "[h]is testimony was conflicting and unclear and . . . he was not aware of any specifics until after the verdict was rendered." The court also found that: extrajudicial information was procured by or shared with some jurors regarding the difference in the seriousness of some of the charges; two jurors "Googled" the charges for the definition of first and second degree, resulting in their belief that one charge was more serious than the other; and some jurors knew one charge was a

8

felony and one charge was a misdemeanor. The court acknowledged that this created a presumption of prejudice but concluded that the State overcame the presumption by establishing beyond a reasonable doubt that no harm occurred in that there was no reasonable possibility that the misconduct contributed to the verdict.

The trial court explained that because it was prohibited from inquiring about the extrajudicial information's impact on the jury, prejudice had to be assessed by reference to its type, how it was relevant to the issues decided by the jury, and whether it impacted some fundamental principle of criminal law. The court stated that although two jurors "Googled" first and second degree, the statutory descriptions of the crimes were on the indictment and these descriptions were the basis of several jurors' belief about the nature of each crime. The trial court acknowledged that "jurors might be more likely, if they knew a potential sentence, to reach a verdict as a result of sympathy or retribution," but it concluded that simply knowing one charge is more serious than another "far expands this reasoning." Jurors' knowledge about the seriousness of a charge cannot be eliminated, and jurors who are faced with multi-count indictments often know, without engaging in misconduct, which charges are more serious as a result of the conduct alleged or by simply being aware of the law.

The court further reasoned that the extrajudicial information here was neither evidentiary nor related to the application of the law.

The trial court emphasized that it had specifically charged the jury (1) about the different underlying charges when defining first-degree and second-degree vehicular homicide, and (2) that the jurors were only to concern themselves with guilt or innocence. The court explained that the jurors' questions during deliberations — requesting to watch a video recording from inside the bus that had been played at trial, asking if there were photographs of tire marks left by the bus on the road, and requesting the definition of "reckless" — revolved directly around the contested issues regarding whether Harris engaged in reckless driving or was speeding, and focused on evaluating the experts' testimony and applying the appropriate law to the facts. This appeal followed.

In her sole enumeration of error, Harris argues that the trial court abused its discretion in denying her motion for new trial because the State did not prove beyond a reasonable doubt that she was not harmed by the juror misconduct. We disagree.

A trial court "has the superior vantage point from which to evaluate juror misconduct." (Citation and punctuation omitted.) *United States v. Ifediba*, 46 F.4th 1225, 1241 (III) (B) (11th Cir. 2022). And a trial court's ruling based on such

10

misconduct is "entitled to great deference." *Lockridge v. State*, 260 Ga. 528, 529 (397 SE2d 695) (1990). More specifically, "[a] motion for new trial because of improper juror conduct is addressed to the sound discretion of the trial judge, and unless there is an abuse of discretion, an appellate court will not upset the trial court's determination." *Dorsey v. State*, 279 Ga. 534, 544 (5) (615 SE2d 512) (2005). Whether juror misconduct has been shown "is a question of fact for the trial judge, whose findings we will not disturb unless clearly erroneous or wholly unsupported by the evidence." (Citation and punctuation omitted.) *Byrd v. State*, 251 Ga. App. 83, 85 (2) (553 SE2d 380) (2001).

"It has long been recognized by the courts of this state that the guarantee of a fair and impartial jury is a central safeguard to a fair trial in our system of criminal justice." *Lockridge*, supra, 260 Ga. at 529. A juror's study of "law" other than that charged by the trial court constitutes misconduct. *Steele v. State*, 216 Ga. App. 276, 278 (2) (454 SE2d 590) (1995), disapproved of on other grounds by *Kennebrew v. State*, 267 Ga. 400, 404 n. 2 (4) (480 SE2d 1) (1996).

"To set aside a jury verdict solely because of irregular jury conduct, a court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process." (Citation and punctuation omitted.) *Harris II*, supra, 314 Ga.

11

at 53 (2). "When irregular juror conduct is shown, there is a presumption of prejudice to the defendant, and the prosecution carries the burden of establishing beyond a reasonable doubt that no harm occurred." (Citation omitted.) Id.

> To establish that the juror misconduct was harmless beyond a reasonable doubt, the State must show based on the record evidence that there is no reasonable possibility that the juror misconduct contributed to the conviction. This will be the case where the State establishes that juror misconduct was an immaterial irregularity without opportunity for injury.

(Citations and punctuation omitted.) Id. at 54 (2).

Because OCGA § 24-6-606 (b) prohibits direct inquiry about how the extrajudicial information affected the jury, in the instant case prejudice must be assessed by considering such factors as "the type of extrajudicial information at issue (e.g., whether the information concerned sentencing or the underlying substantive law)" as well as

> how the extrajudicial sentencing information might have been relevant to the issues decided by the jury, whether the record evidence suggested that this sentencing information would affect the jury's decision on guilt or innocence, and whether the [trial] court had charged the jury that sentencing was an issue outside the province of the jury.

12

(Punctuation omitted.) *Harris II*, supra, 314 Ga. at 56 n. 4 (2).[2]

Here, as an initial matter, we conclude that the trial court's factual findings are not clearly erroneous. Specifically, the court found that while some jurors were subjected to extrajudicial information that first-degree vehicular homicide was a more serious offense and carried a harsher sentence than second-degree vehicular homicide, the jurors were not subjected to extrajudicial information regarding the sentencing ranges for these offenses during deliberations. Although juror C. S. testified that she knew such ranges based on a Google search and juror A. J. provided conflicting testimony as to whether he knew such ranges, "[c]redibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact. The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony." *Tate v. State*, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994).

> We usually assume that trial judges have done their job, and especially where, as here, the trial court has made extensive findings of fact, we generally must presume that the absence of a finding of a fact that would

---

[2] The Supreme Court noted in *Harris II* that the trial court correctly considered these factors here. 314 Ga. at 56 n. 4 (2).

13

tend to undermine the conclusion of the trial court reflects a considered choice to reject the evidence offered to prove that fact[.]

*Hughes v. State*, 296 Ga. 744, 747 (1) (770 SE2d 636) (2015). Given the trial court's extensive findings of fact, it is apparent that the court rejected C. S. and A. J.'s testimony that they knew the sentencing ranges and accepted the testimony of the other jurors that they were not aware of such ranges. See *Burney v. State*, 309 Ga. 273, 293 n. 16 (5) (845 SE2d 625) (2020) ("In reaching its ruling, the trial court appears to have credited the testimony given by [a juror] at the hearing on the motion for new trial and disregarded her statement to the investigator to the extent it conflicted with her hearing testimony. Because the trial court was sitting as a trier of fact in determining what transpired during jury deliberations, we defer to its resolution of this and any other conflicts or inconsistencies in the evidence presented."); *Miller v. State*, 288 Ga. 286, 289 (2) (702 SE2d 888) (2010) ("[T]he trial court may have chosen not to include any mention of the evidence forming the basis of the dissent's decision because the trial court rejected that portion of the officers' testimony.") (emphasis omitted).

Turning to the trial court's ultimate ruling, we conclude that the court did not abuse its discretion in determining that there was no reasonable possibility that the

14

juror misconduct contributed to the conviction. Most importantly, the court was authorized to find that, even without the extrajudicial information, the jurors were already aware that first-degree vehicular homicide was a more serious crime and carried a harsher punishment than second-degree vehicular homicide. Such awareness was reasonably based on the jurors' general knowledge, the description of the crimes in the indictment, and the obvious relative meaning of the terms "first degree" and "second degree." While a juror's accessing extrajudicial information regarding a crime's sentencing range may cause the juror to fashion a verdict based on the desired sentence rather than the evidence, see *Harris II*, supra, 314 Ga. at 58 (2), the trial court did not clearly err in finding that the jurors did not access such information here. Cf. *Steele*, supra, 216 Ga. App. at 278-279 (2) (new trial was required where juror shared with other jurors an encyclopedia entry stating the "usual penalty in the U.S." for the charged crimes, which differed from the penalty in Georgia); *Moore v. State*, 172 Ga. App. 844, 847 (324 SE2d 760) (1984) (new trial was required where jury accessed extrajudicial definition of voluntary manslaughter, which was misleading in that it was "closely akin to self-defense, or at least involuntary manslaughter by self-defense using more force than necessary").

15

As the trial court recognized, a juror's knowledge that one crime is more serious than another often cannot be eliminated. "External matters include publicity and information related specifically to the case the jurors are meant to decide, while internal matters include the general body of experiences that jurors are understood to bring with them to the jury room." (Punctuation omitted.) *Warger v. Shauers*, 574 U. S. 40, 51 (IV) (135 SCt 521, 190 LE2d 422) (2014). While the actions of the two jurors here in independently researching the meaning of "first degree" and "second degree" were improper, the actions were harmless beyond a reasonable doubt in that the information they revealed — that one crime was more serious than the other — was already known to the jury. See *Burney*, supra, 309 Ga. at 292-294 (5) (juror's use of an online search engine to look up the terms "malice" and "malice murder" during deliberations did not warrant a new trial); see also *Smith v. Nagy*, 962 F.3d 192, 204 (III) (A) (6th Cir. 2020) ("[T]he jurors could have reached the mistaken conclusion that felony murder carries a relatively light sentence based simply upon preconceived notions or beliefs about the legal system. In other words, the jurors' information about [the defendant's] possible sentence falls within the realm of general information that jurors bring with them into deliberations.") (citation and punctuation omitted).

Furthermore, while it is but one factor in our analysis, the jurors' independent research simply went to the relative seriousness of the charged crimes and did not touch upon Harris's guilt or innocence. See *Harris II*, supra, 314 Ga. at 56 n. 4 (2) (stating that "whether the information concerned sentencing or the underlying substantive law" is relevant in analyzing Harris's juror misconduct claim); *Boles v. State*, 168 Ga. App. 904, 908 (2) (310 SE2d 741) (1983) (concluding that a juror's actions in accessing extrajudicial information were harmless beyond a reasonable doubt because the information "did not go at all to the sole issue determinative of guilt or innocence"). And the potential of any improper juror considerations flowing from the extrajudicial information was diminished by the trial court's instruction that sentencing was an issue outside the province of the jury. See *Harris II*, supra, 314 Ga. at 56 n. 4 (2) (stating that whether the trial court "had charged the jury that sentencing was an issue outside the province of the jury" is relevant in analyzing Harris's juror misconduct claim); see also *Womac v. State*, 302 Ga. 681, 683 (2) (808 SE2d 709) (2017) ("[Q]ualified jurors are presumed to follow the instructions of the trial court.") (citation omitted).

The record evidence does not suggest that the extrajudicial information regarding the relative seriousness of the crimes affected the jury's decision on guilt

or innocence. See *Harris II*, supra, 314 Ga. at 56 n. 4 (2) (stating that "whether the record evidence suggested that this sentencing information would affect the jury's decision on guilt or innocence" is relevant in analyzing Harris's juror misconduct claim) (punctuation omitted). As the trial court recognized, the jury's questions displayed a focus on the evidence and the law regarding Harris's manner of driving rather than a preoccupation with punishment. And the State's evidence that Harris engaged in reckless driving was strong. Specifically, the suggested speed for the sharp downhill turn was 15 mph, but the State's expert testified that the bus was traveling between 29 and 35 mph when it left the road, and Harris's own expert testified that the bus was exceeding 15 mph when it entered the curve. Both Harris and a student on the bus stated after the crash that Harris had been driving fast, and a post-crash inspection of the bus did not reveal any mechanical issues.

Harris's emphasis on the fact that the State did not present its own evidence or witnesses at the motion-for-new-trial hearing is unavailing. The State was entitled to rely on the available record evidence to show that there was no reasonable possibility that the juror misconduct contributed to the conviction. See *Harris II*, supra, 314 Ga. at 54 (2). Finally, contrary to Harris's assertion, the trial court did not fail to analyze

18

the specific evidence in this case, as it assessed how the extrajudicial information and the jury's questions related to the evidence at trial.

In conclusion, because the trial court did not abuse its discretion in denying Harris's juror misconduct claim, we affirm the trial court's order denying her motion for new trial.

*Judgment affirmed. Dillard, P. J., and Rickman, J., concur*.